IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CHANNARY HOR, individually, | No. 85018-1-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| THE CITY OF SEATTLE, a Washington Municipal Corporation, | |
| Respondent, | |
| AARON GRANT, ADAM THORP, and OMAR TAMMAM, | |
| Defendants.† | |

DÍAZ, J. — In 2013, a jury found that the City of Seattle (City) was not liable for injuries suffered by Channary Hor in a 2006 car accident involving the Seattle Police Department (SPD). In 2017, a newspaper reported the suicide of one of the SPD officers involved in the accident, Aaron Grant, and attributed it to his remorse over the accuracy of his trial testimony. Hor subsequently twice moved the trial court to vacate the 2013 judgment under CR 60(b)(4) and (11). In this appeal, we are asked to resolve whether the court erred in denying the second, most recent

---

† These defendants are not participating in this appeal.

motion, which was brought after Hor conducted additional discovery. We conclude the court did not abuse its discretion when it found Hor failed to establish by clear and convincing evidence that Grant had committed misconduct or a misrepresentation, and when it found that Hor had a fair opportunity to argue her theory of liability at trial without this evidence. Thus, we affirm.

I.    BACKGROUND

In May 2006, Hor was sitting in the passenger seat of Omar Tammam's car in Seward Park when SPD Officers Adam Thorp and Aaron Grant approached them. Tammam fled and, shortly after exiting the park, crashed his car into a rock wall at a high rate of speed. The crash inflicted severe injuries on Hor.

In September 2010, Hor filed suit for damages against Tammam and the City, alleging Officers Thorp and Grant engaged in a negligent pursuit of Tammam as he fled. In June 2013, a jury found Tammam alone was liable for negligence and not the City. This court affirmed the verdict in an unpublished opinion. Hor v. City of Seattle, 70761-2-I (Wash. Ct. App. Aug. 3, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/707612.pdf ("Hor I").

In May 2017, the *Tacoma News Tribune* published an article reporting Grant's suicide. The article claimed Grant was "haunted by his testimony" given at the 2013 trial and "believed he lied under pressure to aid the city's case, according to his boss and former co-workers" at the Lakewood Police Department (LPD), where Grant had worked after the 2006 incident.

Following the publication of that article, Hor obtained sworn testimony from three of Grant's colleagues at LPD who claimed to have spoken to Grant about his

2

trial testimony. Hor v. City of Seattle, 18 Wn. App. 2d 900, 904-06, 493 P.3d 151 (2021) ("Hor II"). Hor then moved the court under CR 60(b)(4) to vacate the 2013 judgment. Id. at 902-03. The court denied the motion. Id. at 903. In Hor II, this court reversed and remanded the matter to the trial court, holding it was "unclear" whether the court conducted the entire CR 60(b)(4) "fraud, misrepresentation or other misconduct" analysis, or whether it only considered Hor's claim of fraud. Id. at 912-13. This court also permitted the trial court to order additional discovery, which it did and which the parties conducted. Id. at 913.

In December 2022, armed with a more comprehensive record, including six deposition transcripts, Hor renewed her motion to vacate the judgment under CR 60(b)(4) and (11). After oral argument, the court denied Hor's motion in February 2023. Hor now timely appeals.

## II. ANALYSIS

### 1. Standard of Review

As a preliminary but important matter, Hor argues that this court should review her motion to vacate de novo, for two overarching reasons. First, Hor argues that we should not apply a more deferential standard because the judge ruling on the CR 60 motion was not the same as the trial judge who presided over the trial. Second, Hor argues that, because the court resolved the motion to vacate solely on documentary evidence (as opposed to on live testimony), the court's findings deserve no deference. We disagree.

Hor made the first argument in Hor II and, as Hor recognizes, this court expressly rejected it. Hor II, 18 Wn. App. 2d at 911. Per RAP 2.5(c)(2), we decline

to exercise our discretion to "review the propriety of an earlier decision of the appellate court in the same case." More substantively, Hor offers no further authority on point. Hor cites numerous cases that discuss the general benefits of a court observing live testimony in certain distinguishable types of cases.[1] However, none of the cases Hor offers held that no deference is due a trial court judge who resolved a motion to vacate but did not sit on the original trial. We decline the invitation to make any such rule here.

As to the second argument, we begin by noting, as Hor acknowledges, that this court generally reviews CR 60(b) motions to vacate for abuse of discretion. In re Marriage of Bresnahan, 21 Wn. App. 2d 385, 406, 505 P.3d 1218 (2022). And this court has previously considered the exact same argument Hor makes now in Lindgren v. Lindgren, 58 Wn. App. 588, 595, 794 P.2d 526 (1990). That is, the movant there argued that, because "the trial court heard no oral evidence when it decided the motion to vacate, the standard of review on appeal should be de novo." Id. We recognized the appellant "correctly asserts that no deference must be given to a trial court's finding of fact with respect to documentary evidence." Id. However, we also "note[d] that the discretionary judgment of a trial court of whether to vacate a judgment is a decision upon which reasonable minds can sometimes differ," meaning that "if the discretionary judgment of the trial court is based upon tenable grounds and is within the bounds of reasonableness, it must be upheld."

---

[1] For example, Hor cites to State v. Babcock, 145 Wn. App. 157, 163, 185 P.3d 1213 (2008), which discussed the standard of review for a motion for mistrial, and to State v. Johnson, 185 Wn. App. 655, 670-71, 342 P.3d 338 (2015), which discussed the standard of review for evidence admitted under ER 403.

Id. In other words, the court still endorsed a deferential standard of review for a motion to vacate based solely on documentary evidence, where there is an exercise of discretion.

Most importantly, this approach is consistent with our Supreme Court's later important holding that, "where competing documentary evidence must be weighed and issues of credibility resolved, the substantial evidence standard is appropriate." Dolan v. King County, 172 Wn.2d 299, 310, 258 P.3d 20 (2011). Helpfully, our Supreme Court explained that

> Appellate courts give deference to trial courts on a *sliding scale* based on how much assessment of credibility is required; the less the outcome depends on credibility, the less deference is given to the trial court. Washington has thus applied a de novo standard in the context of a purely written record where the trial court made no determination of witness credibility. However, substantial evidence is *more appropriate*, even if the credibility of witnesses is not specifically at issue, in cases such as this where the trial court *reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies*, and issued statutorily mandated written findings.

Id. at 311 (internal citations omitted) (emphasis added).

Here, all six of the LPD witnesses supporting Hor's motion to vacate participated in video-taped depositions, generating over four hundred pages of testimony. And the court reviewed, not only those depositions, but the record of the entire trial, numbering nearly nine thousand pages, which both provided "the context . . . at issue" and, which even Hor argues, was "require[d]" to conduct a CR 60(b) analysis. In short, the superior court below reviewed an "enormous amount of documentary evidence" from numerous witnesses. Dolan, 172 Wn.2d at 311.

The court then expressly "weighed that evidence, resolved . . . evidentiary conflicts and discrepancies," and–as Hor also acknowledges—made credibility findings about the video-taped depositions. Id. In sum, within Dolan's "sliding scale," the substantial evidence standard seems "more appropriate" in this case. 172 Wn.2d at 310-11.

In response, Hor points again to the fact that some Washington courts have declined to use a deferential standard of review for proceedings based solely on documentary evidence. Br. of Appellant at 51-52 (citing Davis v. Dep't of Labor & Indus., 94 Wn.2d 119, 124, 615 P.2d 1279 (1980) (discussing an exception to applying the substantial evidence rule where findings are based on "written, graphic material and not oral testimony"); Nygaard v. Dep't of Labor & Indus., 51 Wn.2d 659, 661, 321 P.2d 257 (1958) ("Where the trial court does not have the advantage of seeing and listening to witnesses, its findings may be disregarded, provided they are based upon a written record that is before us in its entirety."))[2]

---

[2] Hor submitted two Statements of Additional Authorities (SAA). In the first, Hor offers additional caselaw supporting a de novo standard of review. SAA (Apr. 1, 2024) at 1. However, this court has explained that the RAP (10.8) addressing SAAs was "intended to provide parties an opportunity to cite *authority decided after the completion of briefing*. We do not view it as being intended to permit parties to submit to the court cases that they failed to timely identify when preparing their briefs." O'Neill v. City of Shoreline, 183 Wn. App. 15, 23, 332 P.3d 1099 (2014) (emphasis added). As none of the authority Hor offers were decided after the completion of the briefing, we need not consider them. That said, we briefly address the second SAA, submitted after oral argument, as it addressed Dolan directly. Hor argues that the deferential standard of Dolan's "sliding scale" is appropriate only in matters involving statutorily mandated factual findings and, because there is no such requirement for factual findings, no deference is due. SAA (Apr. 19, 2024) at 1-3 (citing Dolan, 172 Wn.2d at 311). This argument presents an overly narrow view of Dolan, which reviewed "cases such as this where the trial court," among other potential factors, "issued statutorily mandated written findings." 172 Wn.2d at 311. In other words, Dolan presented an

Neither Davis nor Nygaard, however, involved motions to vacate. Davis, 94 Wn.2d at 122 (considering an appeal from a bench trial on a discrimination claim); Nygaard, 51 Wn.2d at 660 (considering an appeal from a superior court's review of an administrative decision). And, as Hor conceded at oral argument, there is no binding authority "directly on point" applying the de novo standard to any type of CR 60 motion. Wash. Ct. of Appeals oral argument, Hor v. City of Seattle, No. 85018-1-I (April 18, 2024), at 2 min., 30 sec. through 2 min., 52 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024041185/?eventID=2024041185.

Finally, we are wary of both reviewing appeals from motions to vacate de novo and becoming de facto fact finders, and wary of implicitly requiring courts to hold hearings with live testimony on such motions. These results would effectively move decisions on motions to vacate to the appellate courts and have unintended consequences on the operations of our trial courts, respectively. Moreover, resisting both supports the important principle that, while "circumstances can arise where finality must give way to the greater value that justice," "[f]inality of judgments is a central value in the legal system" and CR 60(b) provides a "balance between finality and fairness by listing limited circumstances under which a judgment may be vacated." Shandola v. Henry, 198 Wn. App. 889, 895, 396 P.3d 395 (2017). If our Supreme Court or our legislature wishes to create a rule

---

illustrative, non-exclusive list of factors in its "sliding scale" framework, many of which are present here, even if not all.

requiring a trial court to hold an evidentiary hearing with each motion to vacate, or be subject to de novo review, it may do so. We decline to create such a rule.

For the reasons above, we will review this matter under an abuse of discretion standard, which directs that a "court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons." Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006). Such an abuse occurs when the court "takes a view that *no reasonable person* would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." Id. (emphasis added).

We review findings of fact for substantial evidence, defined as a "'quantum of evidence sufficient to persuade a rational fair-minded person the premise is true.'" In re Dependency of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022) (quoting Sunnyside Valley Irr. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)). "Unchallenged findings are verities on appeal." Mueller v. Wells, 185 Wn.2d 1, 9, 367 P.3d 580 (2016). We then review de novo whether the trial court's findings of fact support its conclusions of law. Cantu v. Dep't. of Labor & Indus., 168 Wn. App. 14, 21, 277 P.3d 685 (2012).

2. CR 60(b)(4)

a. Overview of Relief under CR 60(b)(4)

Under CR 60(b)(4), a court may relieve a party from a judgment if it was procured by "[f]raud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." At a high level, "[t]he rule is aimed at judgments unfairly obtained, not factually incorrect judgments."

Sutey v. T26 Corp., 13 Wn. App. 2d 737, 756, 466 P.3d 1096 (2020). In other words, an appeal addressing CR 60(b)(4) relief is "limited to the propriety of the denial not the impropriety of the underlying judgment." Bjurstrom v. Campbell, 27 Wn. App. 449, 450-51, 618 P.2d 533 (1980).

Fraud allegations under CR 60(b)(4) are distinct from allegations of misconduct or misrepresentation, in that the party must establish the nine common law elements for fraud. In re Marriage of Maddix, 41 Wn. App. 248, 252, 703 P.2d 1062 (1985).[3] A party alleging misrepresentation or misconduct need not show the elements of fraud. Id. Still, while neither "misrepresentation" nor "misconduct" is defined by CR 60, common law "misrepresentation" requires the moving party have "reasonably relied" on the information provided. Dewar v. Smith, 185 Wn. App. 544, 562-63, 342 P.3d 328 (2015). And, "misconduct" has been defined as a "dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust." BLACK'S LAW DICTIONARY, 1193 (12th ed. 2024).

Further, "[t]he trial court may grant relief under CR 60(b)(4) without considering the *probable effect* of the misconduct on the trial's outcome." Mitchell v. Wash. State Inst. of Pub. Policy, 153 Wn. App. 803, 825, 225 P.3d 280 (2009) (emphasis added). In other words, CR 60(b)(4) relief "does not require a showing the new evidence would have materially affected the outcome of the first trial" which would be "little better than speculation." Taylor v. Cessna Aircraft Co., Inc.,

---

[3] While she references the fraud prong of CR 60(b)(4) indistinctly from misrepresentation and misconduct prongs throughout her briefing, Hor does not attempt to establish the nine common law elements, and thus we will not consider this prong further.

39 Wn. App. 828, 836-37, 696 P.2d 28 (1985).

That said, a party's misrepresentations are irrelevant if "there is no connection between the [adverse party's] misrepresentation and" the case's outcome.  People's State Bank v. Hickey, 55 Wn. App. 367, 372, 777 P.2d 1056 (1989).  After all, reasonable reliance is an element of negligent misrepresentation.  Dewar, 185 Wn. App. at 561-62.  And the movant must show the offending party "obtained" an "unfair judgment" by means of misconduct or misrepresentation to receive relief under CR 60(b)(4).  Sutey, 13 Wn. App. 2d at 756.

More specifically, "[t]o prevail on a CR 60(b)(4) motion, the moving party 'must establish by *clear and convincing evidence* that the fraudulent conduct or misrepresentation *caused* the entry of the judgment *such that* the losing party was prevented from *fully and fairly* presenting its case or defense.'"  Bresnahan, 21 Wn. App. 2d at 406 (emphasis added) (quoting In re Vulnerable Adult Pet. for Winter, 12 Wn. App. 2d 815, 830, 460 P.3d 667 (2020)); Lindgren, 58 Wn. App. at 596 (same).  "'Clear and convincing evidence exists when the evidence shows the ultimate fact at issue to be *highly probable*.'"  In re Pers. Restraint of Sargent, 20 Wn. App. 2d 186, 206, 499 P.3d 241 (2021) (quoting State v. K.A.B., 14 Wn. App. 2d 677, 696, 475 P.3d 216 (2020)) (emphasis added).

Tying these principles together, the overarching question on appeal, then, is whether the trial court abused its discretion by making a mistake of law or by making a finding of fact that "no reasonable person" would make, namely: in finding that Hor failed to show it was "highly probable" that the allegedly improper testimony "caused" the unfair judgment in such a way that Hor could not "fully *or*

fairly" present her case. These overlapping standards present a series of high hurdles for Hor, indeed.

b. Discussion

Hor principally argues that (i) "substantial evidence d[id] not support the trial court's findings" in a way that is (ii) "necessary to support its CR 60(b)(4) conclusions of law," i.e., that the court misapplied the law to the facts before it in its conclusions of law.[4] We will address each argument in turn and principally address only the findings and conclusions of law Hor challenges which are necessary for our analysis.

    i.    Substantial evidence for the challenged findings of fact

We consider in turn the court's (a) findings of fact related to Grant's alleged misrepresentations and (b) mixed findings of fact and conclusions of law as to whether Hor could fully *or* fairly still present her case.

(a) Grant's alleged misrepresentations

With her second motion to vacate, Hor presented testimony from six LPD

---

[4] Hor does not flatly claim the court based its decision on an incorrect legal standard, but instead she avers that an "incorrect legal standard *infects* the trial court's findings and conclusions," in that "the trial court *inherently* couched its analysis in terms of whether other evidence potentially supported Respondents' theories of the case" when "viewed the evidence in the light most favorable" to the City. This argument is belied by the fact that, as Hor acknowledged at oral argument, the court expressly disclaimed the "incorrect" standard, and expressly applied the standard stated in Hor II, 18 Wn. App. 2d at 911-12; Hor v. City of Seattle, No. 85018-1-I (April 18, 2024), at 7 min., 20 sec. through 7 min., 35 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024041185/?eventID=2024041185 ("the trial court applied a legally incorrect heightened standard to Ms. Hor's request for CR 60(b)(4) relief, just as it did previously in the case.").

witnesses, Anders Estes, Michael Wulff, Svea Pitts, John Unfred, Michael Zaro, and Jeremy Vahle, who—according to Hor—collectively testified to three important facts: [1] "that Grant had admitted . . . that he had been engaged in a pursuit of [the car]; [2] did not recall at the time of trial whether he had deactivated his lights; [3] lied in his trial testimony [about both facts, after being subjected to pressure by the City's attorneys]; and had betrayed his badge by doing so," i.e., in all these ways contradicted his trial testimony and, thus, committed misconduct or misrepresentation. For the reasons below, we hold that the court did not abuse its discretion in finding the evidence Hor presented fell short of presenting "clear and convincing" evidence of misrepresentation or misconduct.

As to the first two officers, Estes and Wulff testified that Grant had told them he had "lied" at trial and had used the term "pursuit" when discussing his testimony with them. Even so, the court found:

> Estes' and Wulff's testimony is suspect and less than credible. Both officers were under investigation by the Lakewood Police Department about misconduct, dishonesty, and insubordination related to a vehicle pursuit they were both involved in. They were close friends. And they had a motive to detract attention from their own misconduct by alleging and complaining that Grant had engaged in dishonesty and had not been investigated or disciplined. In a June 2017 deposition in an unrelated lawsuit filed against [LPD] in 2016, Police Chief Michael Zaro testified that Estes 'was known for making [Grant's] life miserable by walking around saying [Grant] should be fired.'

Hor now argues this finding is not supported by substantial evidence. We disagree.

When deposed, Estes conceded that he had been "investigated for making false statements" while at LPD. LPD notified Estes of this investigation in June

12

2016.  The investigation concerned a pursuit in which Estes was involved.  Specifically, LPD alleged he falsely stated over his patrol car radio that he was rammed by the suspect's vehicle.  Estes retired before the investigation could be completed.  Due to this investigation, LPD added Estes to a list of officers, pursuant to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), whom they must disclose to future litigants as possibly untrustworthy.[5]  Thus, there is substantial evidence that Estes had been under investigation for "misconduct and dishonesty," as the court found.

Estes also repeatedly and expressly tied his testimony on Grant to his own disciplinary issues.  For example, Estes testified his investigation began "after the Grant incident and after they really wanted me gone," and that the investigation was LPD "fishing for something."  Further, Estes claimed Grant was "an officer favored by the administration," which had "d[one] nothing to correct [Grant's] false testimony" despite Estes' three letters to the City of Lakewood.  Estes also claimed he sent a letter "point[ing] out that the administration failed to investigate or act on the fact that Officer Grant gave false testimony in the Seattle case."  Thus, there is substantial evidence that Estes' testimony on Grant was motivated by or connected to Estes' own disciplinary issues.

Wulff participated in and was investigated for the same pursuit for which

---

[5] "In Brady, this Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting Brady, 373 U.S. at 87).  "We have since held that the duty to disclose . . . encompasses impeachment evidence as well as exculpatory evidence."  Id.

Estes was investigated. Specifically, Wulff pursued the suspect's vehicle alongside Estes, and Estes was acting as Wulff's supervisor. Wulff further described Estes as a "dear friend." Thus, there was substantial evidence that Wulff's testimony was similarly motivated by his own disciplinary issues or other personal bias.

Thus, we hold the court did not abuse its discretion because a reasonable person could find that these first two officers were not credible.

As to the remaining four witnesses—Pitts, Unfred, Zaro, and Vahle—the court additionally first found their testimony "describes a deeply troubled man" in that "Grant's anxiety and depression had roots in the Tammam/Hor incident and his testimony in the Hor trial," but "it does not appear that Grant's testimony was false or dishonest. . . . His subsequent tortured ruminations about that testimony do not show that he had been dishonest." The court additionally found their testimony "about Grant's use of the term 'pursuit' in his conversations with them about the Tammam/Hor incident is not reliable evidence" as these "references to 'pursuit' are inconsistent, vague, and – as plaintiff uses them in her briefing – conclusory" Lastly, the court found that "the totality of all the facts and circumstances found in the trial record is much more important than a loose use of the term 'pursuit.'" Hor also challenges each of these findings for substantial evidence. We again disagree.

Pitts answered "[n]o" when asked if she "recall[ed] anything about emergency lights in [her] discussions with Officer Grant." Further, Pitts' testified Grant "never said that he lied." She also could not remember whether Grant used

14

the word "pursuit." Instead, Grant "never said he was told to answer a certain way . . . [j]ust that he didn't feel like he got to express himself fully" at trial.

Unfred's testimony repeatedly indicated he was not confident in his memory regarding Grant. Instead, Unfred generally stated that "I know Officer Grant told me he was troubled by his testimony at some point in the original case, about his truthfulness" but "[t]hat's about as much as [he] recall[ed]" and he "d[idn't] recall specifics or wording."

Similarly, Zaro's testimony similarly flagged potential memory issues. Initially, Zaro acknowledged his previous testimony where he was asked whether "'Grant c[a]me to [him] and sa[id] that he had given false testimony in a case where he was asked to testify?'" and he responded "'he believed so, yes.'" However, Zaro then testified he could not remember the first time he discussed Hor's case with Grant, or how many times he discussed the subject with Grant. More notably, Zaro also testified he didn't remember anything about Grant being "browbeat by a civil attorney" and had testified "I don't know that" when asked if Grant committed suicide because he felt pressured to lie at Hor's trial. Further, when pressed to quote specific words Grant used, he responded, "I can't answer that. You're asking me to quote him, and I can't do that." Instead, Zaro testified he "do[esn't] remember it being specifically about [Hor] all the time. There was – just the general topic of his anxiety."

Vahle initially testified that Grant "thought and felt that he was not honest during his testimony." Further, he stated Hor's incident "turned into a pursuit" in a general sense, adding he "d[idn't] remember where [Grant] got into the pursuit at,

15

but he wasn't the primary officer." He also answered affirmatively when asked if "Grant had talked to you about his lack of memory about certain details of the pursuit." Vahle later added the caveats that "I don't remember [Grant] complaining about being pressured," and that "I don't remember him saying [he] lied," and instead likened Grant's conversation to "word vomit."

From the above, we hold the court did not abuse its discretion in finding that Hor had not established by clear and convincing evidence, based on these four officers' testimony, that Grant [1] stated he had been "in pursuit," [2] stated that he did not recall at the time of trial whether he had deactivated his lights; and [3] stated that he lied in his trial testimony about both facts. That is, a reasonable person could conclude, as the court did, that Grant's statements to these four unbiased officers were the musings of a "a deeply troubled man." And, there was otherwise no corroborating evidence of the City's alleged pressure. In turn, there is insufficient evidence, on our standard of review, to conclude that Grant or the City engaged in misconduct or made misrepresentations at the time of trial.

(b) Whether Hor could fully or fairly still present her case.

Even if the foregoing conclusion is incorrect—i.e., "no reasonable person" would conclude that none of the witnesses' testimony established that Grant committed misconduct or misrepresentations—Hor still fails to show it was "highly probable" that his arguendo improper testimony "caused" the unfair judgment in the sense that Hor could not "fully or fairly" present her case.

Here, the court found that Grant's trial "testimony was consistent with the declaration[s]" and that "Grant's imperfect memories were thoroughly explored in

16

plaintiff's attorney's examination of Grant." Hor now challenges both of these findings as lacking substantial evidence. We again disagree.

As Hor acknowledges, the parties "argued early and often" about whether SPD Officers Grant and Thorp engaged in an unlawful pursuit preceding the 2006 crash. Hor does not challenge the court's findings (and thus it is a verity) that the jury considered all of Grant's various sworn statements and testimony as to when he turned off his emergency lights. Mueller, 185 Wn.2d at 9. As Hor also acknowledges, the parties disputed at trial when the lights were deactivated as part of a broader dispute on whether Tammam could have even seen Grant's vehicle after leaving the park.

More specifically, Grant's testimony included a 2011 sworn declaration, a 2012 deposition, and his 2013 trial testimony.

In his 2011 declaration, Grant stated "[t]he vehicle accelerated out of the park, in my direction. I activated my emergency lights, but had to swerve and break in order to avoid being hit by the vehicle . . . I had to make a three point turn in order to turn around, then proceeded out of the park westbound on South Juneau, in the direction that I had seen the vehicle go" but he "did not see the vehicle on S. Juneau." As such, "[b]ecause [he] had lost a visual (sight) of the vehicle . . . I was not going to be operating in emergency (pursuit) mode" and, "*to the best of my recollection*, I turned off my emergency equipment (lights) at this point." (Emphasis added).

In his 2012 deposition, Grant was asked if he "had an opportunity to turn on [his] emergency roller lights?" Grant responded that "*I cannot recall* if I did at that

point or not." (Emphasis added). Further, Grant was asked if he had "any impression at all as to whether or not in the circumstances that is something you would normally do as a routine habit?" Grant responded that "[i]t all depends on the situation. *I just can't recall* in this situation. It's been too long." (Emphasis added).

At trial—again acknowledged by Hor—Grant testified that he had since recalled when he turned on his lights, but he also admitted "that he had previously testified at his deposition that he could not recall whether and when he deactivated his emergency lights." Hor argues that, because Grant's trial testimony was inconsistent with his later statements to colleagues, she was unable to fully present her case. We hold it was not an abuse of discretion for the trial court to find the record is more complicated.

As the court found, at the 2013 trial, Hor's counsel spent two days questioning Grant and made no secret of her suspicion of Grant's memory in light of Grant's previous sworn declaration and deposition. For instance, Hor's counsel asked Grant whether he could "say, as a matter of fact, that [he] turned off [his] emergency equipment lights; can you sir?" Grant responded that "[a]fter going back down to the park and clarifying some things in my memory, I can." Grant elaborated that, roughly a month prior to the trial, he had gone "down and redrove the park in the area and it brought back some memories of what had happened."

Hor's counsel persisted, repeatedly quoting from Grant's past deposition testimony, including the numerous times Grant said he could not "recall" specifically when he activated his lights or other aspects of the incident. In the

18

face of these inconsistencies, Grant himself acknowledged that the incident "was seven years ago" and that there were "some things that I can remember, and some things that I can't."

In sum, the jury heard Grant's deposition testimony directly quoted and compared with his trial testimony repeatedly and methodically. The jury had ample evidence to look askance at his testimony and was free to accept or reject Grant's explanation that "redr[iving]" the area refreshed his memory. Westby v. Gorsuch, 112 Wn. App. 558, 570, 50 P.3d 284 ("it is the jury's role to make credibility determinations"). Even if we were to credit one of the LPD's officers' testimony that he told them he in fact did not know, e.g., when he turned off his lights, it is not an abuse of discretion for the court to find that Hor's defense was fairly (if not fully) before the jury, where the defense is broadly that Grant was not credible on that possibly important point.

In other words, Hor has not shown that it was manifestly unreasonable to conclude that it was highly improbable that the absence of one additional way to question Grant's memory "caused" the judgment such that she was unable to fairly present her case to the jury. We also cannot conclude that it was manifestly unreasonable to conclude that Grant's various statements were internally consistent as he explained the evolution of his memory overtime.

In response, Hor relies heavily on Taylor, which held that 60(b)(4) relief "does not require a showing the new evidence would have materially affected the outcome of the first trial." Taylor, 39 Wn. App. at 836. We agree, but Taylor, nonetheless, is distinguishable as the defendant there entirely withheld

discoverable information such that the plaintiff "could not litigate issues he did not know existed" meaning the defendant's actions "deprived [the plaintiff] of an alternate theory upon which to argue liability." Taylor, 39 Wn. App. at 837. The present appeal is different in kind; a reasonable person could find that Hor explored the credibility of Grant's memory in depth, even if arguendo the jury was unaware that Grant may have felt personally motivated to testify in a certain way. This singular piece of evidence does not amount to an "alternate theory" of liability. The theory is the same, namely, that two SPD officers engaged in a negligent pursuit by, inter alia, turning on their lights at a certain time and not turning the lights off at a certain time, causing the car to speed. It is not unreasonable to contextualize Grant's motivation for stating he remembered turning off the lights as simply one data point in the same theory of the case.

For these reasons, we cannot hold that the omission of this arguendo evidence "caused" the judgment such that she was unable to fairly present her case to the jury.

ii.    Conclusions of law

Hor also challenges numerous conclusions of law, including non-duplicatively the court's conclusion that, whether "Grant turned on or off his emergency lights was not of controlling importance as to the determination of liability in the Hor trial."[6]

---

[6] Hor additionally challenges the court's conclusions that failed to establish fraud, misrepresentation, or other misconduct by clear and convincing evidence or that "Hor was not prevented from fully and fairly presenting her case." We have addressed this mixed issue of law and fact above.

Hor first challenges the conceptualization of the standard as requiring the misconduct be of "controlling importance." However, this court has already stated in this very matter, "perjury alone does not necessarily rise to the level of fraud to warrant vacation of a judgment . . . Even then, the perjury must be of "'controlling importance.'" Hor II, 18 Wn. App. 2d at 912 (quoting Doss v. Schuller, 47 Wn.2d 520, 526, 288 P.2d 475 (1955)). We again to decline, under RAP 2.5(a), to revisit this decision. More substantively, Hor recognizes that the "controlling importance" cannot "impose a requirement that a CR 60(b)(4) movant must prove that fraud, misrepresentations, or misconduct were *dispositive* or could or would [have] affected the verdict. Rather, all the movant must show is that it was *material* to *their* liability arguments, rather than an immaterial incorrect fact." We likewise do not interpret Hor II to impose a new requirement on a movant, and will address her claim as she presents it.

Even assuming arguendo that Grant's trial testimony amounted to misconduct, the jury had numerous other pieces of evidence to consider in the nearly month long and multifaceted trial. Notably, this evidence included the physical and objective evidence (e.g. the car's "black box," vehicle specifications, and topography measurements), which supported the accident reconstructionist's conclusion that, regardless of whether Grant turned his lights on or off and when, Tammam could not see them. This evidence also provides a tenable basis for the court's finding that Grant's motivation for testifying as he did was not material to Hor's theory of liability.

Finally, it is also notable that Hor did not challenge various important

findings on appeal. Mueller, 185 Wn.2d at 9 ("Unchallenged findings are verities on appeal."). For example, she did not challenge the trial court's finding that Grant witnessed Hor's severe injuries, which could lead a reasonable person to believe Grant was traumatized or otherwise emotionally affected by the scene. After all, numerous witnesses alleged Grant was distressed and conflicted when discussing the trial in some form. As stated by Zaro, "a 16-year-old girl was paralyzed. That's a lot to – that's a lot to deal with." Further, Zaro testified that Grant appeared to "internalize[]" his experience with the 2006 incident and subsequent trial in a way that seemed "irrational." Further, Pitts described Grant's broader mental health outside of the context of Hor's trial, including that it was "not like it was a secret that he battled depression." These facts, again, undermine the materiality to Hor's liability arguments of Grant's later "tortured ruminations" about his testimony. We cannot say it is unreasonable for the trial court to give little credit to a person tragically struggling in this way.

Hor also did not challenge the court's finding that the "six witnesses recently deposed offered no testimony suggesting that Grant was conflicted about his trial testimony about several key facts." These facts included Grant needing to completely turn around to leave Seward Park, Grant stopping at a stop sign before leaving the park, where Grant last saw Tammam's car before the collision, Grant driving slowly enough to look down side streets, that Grant did not see the crash, or what Grant later relayed over the radio to SPD dispatch. In other words, there were numerous facts, beyond Grant's testimony about the lights, for the jury to consider when gauging his role in the incident and the effect on Hor's theory of

liability.

From the above, we hold that the court's conclusions of law were supported by its findings of fact, i.e., they were not manifestly unreasonably applied. As such, the court did not abuse its discretion in denying Hor's CR 60(b)(4) motion to vacate.

3. <u>CR 60(b)(11)</u>

A court can relieve a party from a judgment for "[a]ny other reason justifying relief from the operation of the judgment." CR 60(b)(11). However, CR 60(b)(11) is "not a blanket provision authorizing reconsideration for all conceivable reasons. <u>State v. Keller</u>, 32 Wn. App. 135, 141, 647 P.2d 35 (1982). Instead, it is narrowly "intended to serve the ends of justice in extreme, unexpected situations" or in other words "'extraordinary circumstances,' which constitute irregularities extraneous to the proceeding." <u>In re Det. of Ward</u>, 125 Wn. App. 374, 380, 104 P.3d 751 (2005) (quoting In re Marriage of Knies, 96 Wn. App. 243, 248, 979 P.2d 482 (1999)).

For example, this court has granted CR 60(b)(11) "[i]n rare circumstances" when there is "a change in the law." <u>Id.</u> at 380; <u>Shandola</u>, 198 Wn. App. at 892 (this case addressed "a subsequent court decision invalidating the statutory basis of the judgment"). Another example includes correcting the "fundamental[] wrong" of allowing the "voluntary relinquishment of parental rights" in a termination proceeding. <u>In re Marriage of Furrow</u>, 115 Wn. App. 661, 664, 63 P.3d 821 (2003).

In other words, "'[i]rregularities justify vacation [under CR 60(b)(11)] whereas errors of law do not. For the latter the only remedy is by appeal from the judgment.'" <u>Id.</u> at 674 (quoting Philip A. Trautman, <u>Vacation and Correction of Judgments in Washington</u>, 35 WASH. L. REV. 505, 515 (1960)). In short,

23

Washington courts have held that mere "unfairness" does not rise to the level of CR 60(b)(11). In re Marriage of Yearout, 41 Wn. App. 897, 902, 707 P.2d 1367 (1985).

Here, Hor argues that CR 60(b)(11) relief is warranted as "the evidence does not support that Grant's trial testimony was a routine matter of imperfect memory" and that one "cannot imagine a more fundamental wrong or irregularity in the proceedings than the key witness recanting his testimony on the trial's key issue." This argument fails for two reasons.

First, CR 60(b)(11) relief applies *only* when no other section of CR 60(b) is applicable. Shandola, 198 Wn. App. at 895. In other words, CR 60(b)(11) is not a second chance for arguments presented under another CR 60(b) subsection. As discussed above, Hor has already argued her misconduct and misrepresentation claims at length, which squarely fit under CR 60(b)(4).

Second, it is not apparent how the irregularity here is similar to those enumerated above: there is no substantial change in the law; there is no fundamental right being implicated; and nothing here is "extraneous" to the proceeding, such as an unqualified fact finder. Indeed, at trial, Hor did ask Grant whether he had spoken with the City's counsel prior to his testimony. This line of inquiry was not extraneous to the suit, and perhaps could have revealed alleged bias or lack of credibility, had this line of questioning been further explored.

Finally, Hor's invocation of Henderson v. Thompson, 200 Wn.2d 417, 518 P.3d 1011 (2022), is also unpersuasive. This case held that if "racial bias is a factor in the decision of a judge or jury, that decision does not achieve substantial

justice, and it must be reversed." Id. at 421-22. However, Henderson did not discuss CR 60(b)(11) or even mention CR 60. Even if Henderson addressed CR 60 at any level, systemic biases are not comparable to a single witnesses' alleged regret with his prior testimony, in a trial comprised of numerous other witnesses and voluminous evidence.

For these reasons, we hold CR 60(b)(11) relief is inapplicable.

### III.    CONCLUSION

We affirm the court's denial of Hor's motion to vacate.

Díaz, J.

WE CONCUR:

Feldman, J.                    Coburn, J.

25